Good morning, Your Honor. Cheryl Orr on behalf of Nat'l Fire & Marine Insurance Company. To begin with, the District Court abused its discretion in denying Nat'l Fire's Rule 56D motion. The motion was filed less than 60 days after the complaint was filed, four days before Nat'l Fire filed its answer. The underlying action was in the middle of trial. Nat'l Fire was railroaded by ISOP. The District Court failed to give Nat'l Fire the benefit of conducting discovery. Counsel, let me just ask. One of the things that bothers me about your position is that as I read the record, you didn't conduct any discovery, and you never filed an opposition in response to the partial motion for summary judgment. So how can we declare the District Court abused its discretion? Well, Your Honor, to the extent that we would have conducted discovery while we were defending the underlying action, that would have presented a problem for us as a primary carrier in conflict with our insured. We would have conducted discovery on the merits of the causes and the defects that were at issue in the underlying trial. But the fact remains that you didn't do it, right? That's correct, Your Honor. With respect to the opposition, we asserted the opposition arguments, the same opposition arguments in the Rule 56d motion, that there was no case or controversy present before the Court, that there was no ripe issue for determining the duty to indemnify, and that ISOP was only asking the District Court to issue an advisory opinion on an issue that was not yet decided or ripe for decision. Counsel, I'm trying to distinguish the facts of this case from any other declaratory judgment action that is brought when it's a pure question of law. What is the meaning of occurrence in this policy? And maybe that's a mixed law and fact question, but I am available of any number or I'm aware of any number of other declaratory judgment motions that have been resolved before the underlying litigation was concluded, and it may require affidavits from your claims adjuster with regard to what the allegations are, what preliminary investigation has been conducted. But you didn't offer any of that kind of evidence. You didn't give the District Court any help at all in order to resolve the legal issue. Well, this was the premise of the motion was that this was a pure issue of law, but it's not a pure issue of law. The number of occurrences or the issue of causation is inherently a fact-driven question, and the duty to indemnify, unlike the duty to defend, can only be determined at the conclusion of the underlying trial when the actual liability of the insured is established. Well, let me ask you this question. As I read the policy and as I look at the jury's special verdict, there are a lot of damages that are assessed in that special verdict form that appear to fall within the exclusion clauses of coverage under the policy. Is there a realistic fear here that you're even going to reach a million dollars in initial payouts or? Your Honor, that's the very — that's the point we made, that this whole exercise in this case was really an abstract proposition. ISOP does this in a lot of cases. You saw that they did it in the Turnberry case. They do it in a lot of cases, especially in Nevada. They try to present this issue at the forefront of these cases. That doesn't matter. But — What matters is what's at issue here. And it seems to me that what's at issue here is whether or not the district judge simply looked at the indemnification arguments and ruled as a matter of law, which he did, on the occurrences. You have an issue with the timing on that, but the timing is what it is. The United National Insurance case seems to indicate that the judge correctly construed the positions of the parties at the time, made a legal ruling. And to me, what we ought to be looking at is the merits of the legal ruling. Your Honor, I agree. Let me go back and answer Judge Tallman's question. You're correct. If you look at the jury verdict, which was presented at the time of the reply brief, the jury verdict demonstrates that there is less than, on its face, $175,000 in defects to the condominium units, the individual units and the common areas. And if you actually looked at those particular defects, you will note that many of them are excluded under the national fire policy as your work, like safety issues, defects, pure defects. But if that's the case, then what are you worried about? We're never going to reach the excess insurance. We have at this point Why are you here? Because the determination of the issue as a matter of law, this comes up in many issues. Our insurance carrier is a primary carrier. Well, maybe I'm asking a question that's too practical, but I try to be a practical lawyer. And that is, if it's not likely that you're ever going to have to pay out any money on this claim, then why run the gauntlet with the Ninth Circuit and risk a published opinion on an issue that you say is very important to other cases down the road when it isn't going to be invoked? Well, we don't know ultimately if it will be, because here's the issue. The case is still not in final repose. The case is on appeal. We don't know Can I make a suggestion? I'm sorry. Can I suggest you not speak so close to that mic? Sorry. I'm sorry about that. That's all right. It's okay. The case is not in final repose. The underlying action is still on appeal. It could be that it comes back down. And now we have this ruling that in this particular case by the district court, that under the causation approach that you equate every defect is a different occurrence. And so there are two occurrences. I'm being unfair to your client, but okay, so you've got a ruling in one case by a district judge in the District of Nevada that on a legal issue that you think is wrong. And wouldn't you be better off to just let sleeping dogs lie than to bring it to the Ninth Circuit and have us publish an opinion that's going to make nine Western states and territorial islands? Well, Your Honor, again, this case isn't the underlying action isn't a final judgment. So we still have to have this issue of whether there is the underlying limits are 1 million per occurrence. If this judgment stands, that 1 million occurrence won't be satisfied. I thought Judge Proe said, I'm not making any determination here as to what amounts may be due in Owen. I'm simply giving you an answer to a question of law of what this term occurrence means in the context of a construction lawsuit. And at some point there will be a final judgment, I guess, either in state or federal court that will assign specific amounts to the claims. And then there'll be another opportunity to appeal again, will there not? No, I don't believe so, because this ruling is the ruling regarding ISOP's duty to indemnify and a ruling that the allegations of the second amended complaint and based upon the preliminary defects submitted, this Court has ruled that there are multiple occurrences. And we would submit, Your Honor, that if, in fact, the judgment comes back as retried and say there is another $2 million verdict, and we submit that, no, there is only a single occurrence, ISOP will come back and rely upon this determination and this action to say, no, there are two occurrences here. That's the problem in this case. With respect to the legal ruling, we submit that the duty to indemnify is not a not an issue of law in this case. It's not just a determination of what the definition of occurrence is. The policies define occurrence. The question is, when you apply Nevada law to this particular underlying case, how many occurrences are there? Is there more than one occurrence based upon this particular fact situation? I think the Walshaw and the Bishop ---- based on the theories of the plaintiff in the underlying lawsuit and what the jury credits in its verdict. I mean, frankly, looking at the special verdict form, I can't answer the question of whether or not the jury was thinking that this is one common cause, which is negligence on the part of the contractor and the developer to properly oversee the construction, or whether, as Judge Proh seemed to think, this may be negligence on the part of the plumbing subcontractor, the electrical subcontractor, the architects, the geotechnical engineers, all of the specialists who were involved in it. Well, I think Your Honor is correct in that you cannot tell from the jury verdict what the cause of the defects were. That's why we said you need to go beyond the unproven allegations of the second amended complaint, which was submitted by ISOP and moving for some re-judgment. You need to go beyond the unproven allegations. You need to look what was proven on the record. Clearly the Clark County jury thought that there was negligence by the subcontractors in the manner in which they carried out their construction work. But that doesn't answer the legal question, and that is what theory would define an occurrence in a construction defect case where, as I understand it, your opponent's position is there's one common cause here, and that's the negligence in overseeing the entire project. I actually don't know that. I think that's more our theory. I'm sorry, not our opponent's theory. Yeah, your theory. I think that the Turnberry decision is an important decision. Because if you look at the Turnberry decision, it's a sister company for ISOP making the very same multiple occurrence argument. And what the district court in Nevada did in that case was say, look, Nevada applies a causation approach, and under the causation approach, you don't look at the effects. You don't look at the injury or the damages or how many damages there are to determine the number of occurrences or the number of causes. And so it reversed the trial court, because under the causation approach in that case, the court said the developer here, the developer's responsibility is what you're looking at to determine under this policy how many occurrences there were. And so the developer's negligence or failure, basically presentation and sale of a negligent condominium unit is the liability of the developer. What was then the single specific cause that you would identify as your theory for employing that test here? In this case, it's the same thing. Riverwalk was the developer that sold a negligent condominium complex. And so the liability is for the sale of a complex that has multiple defects, multiple deficiencies. Wait, say that again. Was the developer that sold, I wrote this down, that sold a negligent condominium project? Negligently. What is that? A negligently constructed condominium complex. I apologize. Okay. So is your theory then that there's one cause of action here or one basis for causation, and that is poor inspection of the work that was done? Well, the developer has the overall responsibility under the Nevada statutes not to reach its obligations to prepare a condominium complex that meets all of the codes, et cetera. I thought I heard you say that the cause was the sale. Is that a specifically identified legal negligent sale? I frankly hadn't heard of that before. I thought you were trying to argue that there was one specific piece of negligent construction that caused all the occurrences, but I'm not understanding exactly what you mean by sale now. Well, the developer hires a contractor and the contractor hires a subcontractor. The developer then sells the whole unit or pieces of the unit, the individual unit owners, and then turns over the condominium complex to the unit owners for the management of the common areas. So the developer's liability under the statute is to prepare and sell this condominium complex in the condition that's fit to habitate and not be in a negligent condition. Maybe the district court wasn't so far off then. Apparently Judge Proe relied on a number of different causes that would have been, pursuant to your theory, involved in the sale. He said that alleged defects in the structural components, defects in the electrical and plumbing systems, various independent causes of that sort, were all incorporated in the building as presented in the sale, and there was not a determination then that any of those particular acts emanated from one cause. I mean, none of those emanated from the sale. Those were independent and multiple causes of the damages here. I think that if you look to the Washoe case in Nevada Supreme Court, I think that case demonstrates how the Nevada courts apply the causation context. In that case, there were multiple students who were molested at a daycare center. There were multiple acts of negligence by the employee of the daycare center. But the county that was the insured was responsible for permitting the licensed daycare center. Well, that was a negligent construction case, period. That didn't have anything. The court didn't say anything in the Washoe County case about a sale. They said there was a negligent construction, and that was the cause of all these multiple occurrences. I'm sorry. Washoe was a molestation case. And my point I was making is the Washoe. I think you were talking about the Turnberry. You were talking about Turnberry. All right. But the Washoe case talks about how you don't equate the effects or the harm. There were multiple students that were injured. There were multiple acts of molestation. But the liability of the insured was what you were looking at, not the liability of third parties. I'm sorry. I don't think you fully answered Judge Murphy's question. Let me direct your attention to page 8 of the district court's order. It's at ER 433, where Judge Crowe talks about the fact that he'd reviewed all of these independent . . . or not independent, but various expert reports that identified independent defects in all aspects of the project. And then he goes on to say at line 18, nowhere in the expert reports is there a determination that all of these particular damages emanated from one common cause. So why is it unreasonable for the district court to conclude, since you didn't submit any evidence to raise an issue of fact as to whether there were multiple occurrences, all he had to rely on were the expert reports? But our point was these were preliminary defect lists and preliminary reports that were filed with the preliminary notice that you give before you file suit. These were not proven allegations. But it's the only evidence that's before the district court in ruling on the legal issue that's presented, and you didn't offer anything to create a contested issue of fact? Our submission, Your Honor, in the Rule 56 motion was that there was no case or controversy before the district court that gave it jurisdiction to decide a declaratory judgment action on . . . You made that point in opening, and I've let you go over about 3 minutes. Sorry. Let's hear from the insurance company of Pennsylvania. May it please the Court, Barb Michelides from Michelides Sphinx, Chicago, and with me is Mr. Howard Russell, Weinberg Wheeler Trial Counsel from Nevada. Counsel, before you start, actually, it's Nevada. I'm sorry. But will you address the certification issue, whether or not we should certify this case to the Nevada Supreme Court? Certainly. We sought certification, and I think that's rare, when you've actually prevailed below, but then asked this Court to certify to Nevada. Because we do think this number of occurrence question in the context of a construction defect lawsuit raises a very critical issue under insurance law, and that it is proper to certify. And we believe that there is now at least a technical conflict because of the term barrier decision which we brought to this Court's attention. Well, is go ahead. No, you go ahead. I know where you're going. You're going to ask the same question. Go ahead. You go. Okay. Well, why don't we just wait for the Nevada Supreme Court to resolve the term barrier appeal? Well, we certainly can, but I think term barrier is in its infancy. It will be quite a long time. And I think what we're. They're ahead, though, are they not? I mean, they entered final judgment first on the jury verdict, and I assume there's been a notice of appeal filed. I don't believe term barrier. I believe it was an early determination in the case on the number of occurrences. I do not believe it's on appeal. Are you anticipating another more further jury trials in term barrier? I believe. And you've confused me. I will double check, but my understanding is that term barrier has not been fully tried and it's not on appeal, and that it probably will be quite a while before we get a final determination out of the Nevada Supreme Court. Just the amount of the damages from it? It was a district court opinion. It was a trial court opinion that there was a single as opposed to multiple occurrences on a development project. You and I are talking past one another. I guess I better refer you to what I'm looking at, so we're talking about the same thing. Let's see. Excerpt of record 402, which is a special verdict form filed in the county of Washoe involving the Riverwalk Tower Unit Owners Association versus the Riverwalk Development. That's our case? She's talking about a case that they submitted for judicial notice. Oh, I'm sorry. Okay. We were talking past notice. It's a single state court case. Yes. Which has absolutely no precedential value. Correct. And that's what I was going to ask you is does that really create a conflict because every other judge in the State of Nevada is completely free to ignore that ruling? Well, that's true. I think what we're seeing, and I think this feeds into Judge Tallman's comment earlier. We're trying to find a practical, workable approach to adjusting and resolving construction defect claims in Nevada. I hope I pronounced that properly. And what we see here as the excess carrier, you have to know your attachment point when you go into mediations, when these claims are filed, these lawsuits are initiated. And the only real way to do that is to be able to obtain a principled approach in determining the number of occurrences in a construction defect case. So while Turnberry is not binding precedent and certainly can be and hopefully will be not followed by other State courts, it is an important question and it's something that we feel maybe ultimately does need to be resolved by the Supreme Court. But does it need to be resolved for us to adjudicate this case? Well, no. And that's why we have our alternative arguments. I do think the majority of the briefing in this case has centered upon procedural issues that I don't think are all that critical about whether or not the motion was timely, whether or not the issue was ripe. I think the fact that we're standing here establishes this issue is ripe, because I agree that if in fact we were not in a dispute as to the attachment point, this appeal should never have been brought and pursued. So I feel until we do get, I mean, we certainly can resolve our case. I agree with what you're saying, and if we're going to agree on that, then it would seem to me that Washoe County, which did involve child molestation in a child licensing center, and I apologize for the error earlier, along with Bish v. Guarantee National, along with Insurance Corporation of America v. Rubin, along with this district court ruling in Lexington Insurance v. Illinois Union Insurance, it seems to me that the breadth of State law would indicate that Judge Proe got it wrong here. I don't understand the business about the negligence sale. I've never heard of that before, but it certainly seems to me that if you have that construction and it causes multiple instances of tort damage under all these cases, you have a causal situation that Judge Proe simply didn't get right below. Agree? Well, can we walk through that? Sure. I disagree with your evaluation. I believe that Nevada has clearly adopted the cause test, which we do believe is the appropriate test under the policy, because the policy speaks to cover damages caused by an occurrence. So you have to have the occurrence cause the damages. So I think Rubin is probably our best starting point. That was the adoption of the cause test. Right. And I think we have to be careful here to not confuse the liability theory against the insured and the cause of the damages. So in Rubin, the physician, this is a physician who saw the same patient five different times and misdiagnosed a brain tumor and ultimately was held accountable. And the issue squarely before the Court there was how many occurrences did that, does his treatment of this patient over a course of time present. And the Court found it was five occurrences. It was multiple occurrences, because at each time the doctor made an independent evaluation separated in time and space. But the theory of liability against this physician was one. It was medical negligence. It was just a negligence case. So I think you can't take an oversimplistic view by saying, well, the doctor only did it five times. That's not what happened. Look, Bish says that the Nevada courts, quote, focus on, quote, whether there was one or more cause which resulted in all of the injuries or damages. It seems to me that then if the injuries stem from one proximate cause, there should be a single occurrence. Bish, application insurance versus, excuse me, Appalachian Insurance versus Liberty stands for the same thing. Again, I don't quite understand the opposing argument about the sale in this business, but it seems to me that we would agree that negligence and a poor effort to construct these buildings resulted in the various occurrences, and Judge Proe didn't analyze it that way. I think what you're doing is you're looking, taking too far of a step back. We are talking about disparate and completely different types of defects in the case. And we cited some of the California law that have actually applied the cause test in construction defect cases. And you have to look and you have to say to yourself, did the negligence that caused the damages to the plumbing system have also caused the damages to the electrical system? But that brings me to my question. I'm trying to focus in on what actually Judge Proe was looking at when he made this ruling. And what he had before him were some expert opinions saying that there were several causes, several independent causes, and nothing on the other side. And so Judge Proe did not in the abstract say whether or not there were independent causes. He focused on whether or not there was a material issue of fact raised regarding the issue. And looking at the expert reports on one side and nothing on the other side, he merely said there is no material issue of fact raised one way or the other without making the ultimate determination of what is an occurrence. And that was what he had before him. And I submit that's the best evidence available at that time, because that those reports set the groundwork and the foundation for the evidence that was admitted at trial. And I think it's somewhat disingenuous for my opponent to complain about the use of the experts saying they were outdated, because if, in fact, the trial evidence that was completely available to them because they're defending the case showed anything different or deviated in any material or substantial way, it should have been brought to the Court's attention. But I think the verdict follows on to what the, you know, it's a punch list, essentially, of the defects at the complex. And I think it's consistent throughout. That's where I was going when I was directing your attention to the special verdict form, because it does seem to me that the jury made some pretty fine distinctions in deciding that there are, for example, no damages from the steel moment frame and beam assemblies, but $228,000 in damages for problems with the elevator. And that was our argument below, is that that is the best evidence. That is what the verdict is. That is what the jury found. Those are findings of facts with respect to the actual defects at this project. But why would Judge Proe be wrong? For example, let's take the elevators. Presumably, there was an elevator inspector. I suspect there were probably more than one, including maybe a building inspector for Washoe County who had to sign off on the work that had been done on the elevators. And if the theory is that the inspectors were sleeping on the job or being paid off or, you know, just never showed up to do the inspection but signed off on it anyway, why isn't that the cause for the elevator problem? But that cause doesn't have anything to do with the pool drain piping, for which the jury found $374.40 in damages. And that's exactly the approach we're advocating. You have to look at the defects. And you do have to then look at what is the cause of that defect. And if you can say that it's the same cause, so say there were five elevators that all experienced the same basic problem, we would say that's a single occurrence, the elevator problem defect. But there is nothing about the failure to properly inspect an elevator that can cause a problem in the electrical system or in the pool. If I understood Ms. Orr's argument, although I agree with Judge Murphy, I don't buy this negligent sale or sale of a negligent condominium. I think what she was trying to get at was that the developer of the project owed a duty to the homeowners to deliver a condominium that was fit for human habitation. And the developer was negligent in overseeing the work that all the various subcontractors did and therefore breached its duty. And that is the common cause under their theory of the case, if I understood her argument. Well, and if that is the argument, I think we're back to the Rubin. Okay, Rubin misdiagnosed and was guilty of medical malpractice over the course of treating a single patient. But that doesn't mean it was one event or one occurrence. I thought that the facts of Rubin were that every time the patient came to see the doctor on each of the five occasions, she was exhibiting different symptoms and that that didn't necessarily point the doctor to brain cancer or whatever. Well, and I think, too, the court relies upon his affidavit wherein he says he exercised independent judgment and made a separate diagnosis upon each visit. But we would submit that's the same analogous thing that the general or the developer is doing. I'm not so sure. I mean, suppose that I think it was a little girl came in, the patient, came in complaining of stomach ache and the doctor diagnoses some gastrointestinal problem, but then two months later she comes in with a strep throat or an ear infection. Well, I think these were headaches. I think there was a common complaint of headache, but that there were other various complicating factors. How do you ‑‑ I'm sorry to interrupt. Sorry. I don't want to run out of time, and neither do you. How do you explain then the Nevada Supreme Court concluding that many different instances of child molestation at a daycare center are caused by or were due to one cause, failure to ‑‑ And yes, I agree with you. I step back. But that's how I was reading these cases from Nevada. Well, and I would say I've actually handled a few of these sexual molestation cases, and I think ‑‑ and I just argued one actually in the court of appeals in New York. I think these cases present a very difficult issue with respect to occurrences, because what you typically have is very small infant children who really are incapable of giving a precise account of maybe the number of molestations. The injuries are cumulative and collective. And I think you kind of almost have to carve those cases out into a separate category. Typically, what courts will do is they'll aggregate claims in a policy period, but find multiple occurrences over multiple policy periods, which is kind of a hybrid multiple single occurrence type analysis. And I think it works because there is no real ability to drill down to the damages suffered at each act of molestation. Here we don't have that issue at all. We have concrete physical damages. We have leaking toilets or a problem with the pool, a roof issue. It's describable to separate and individual contractors. Events, acts, yes. It's very easy in the property damage context to make that determination, and that's why I think it doesn't lend itself to the type of approach taken in the sexual molestation cases. One final thing. I read those broad prescriptions of the Nevada Supreme Court in Bish, and again it seems to guide a jurist to the conclusion that proximity of cause and time and space have to be even independently committed, joined in sort of a or at least constituted in a single occurrence to the extent it's logical or rational. And I think in Bish it is. That's where the person ran over the child and then backed up and ran over the child again. So it was truly one event. It was two catastrophic movements in a single event. We're talking about construction development over many months, years, phases, and that's just the time and space there is a very different analysis. So we would submit that Bish is also not that helpful in this context. Counsel, how would you respond if the facts were that had the builder done a better job of inspection, he would have detected the defects and demanded their correction before delivering the units to the public for sale, and that but for the failure to properly inspect and demand that they be repaired, the property was developed and delivered in an unfit condition? I think you'd have to drill down as to what was actually being done at inspection time. Was there an inspector for the elevators and a separate inspector for the plumbing system? Well, I think we know the answer to that. There should be. We didn't take judicial notice of that, but we know there are very different kinds of inspectors for different aspects of the building. And so I think what you would do is you would aggregate the inspections with respect to each defect, so the elevator inspection that failed to uncover the elevator defects, that would be one occurrence. Your position would be you could never have a common occurrence, even though common to each of the separate trades was negligence in inspection and detection of the problem. Well, I think if you have – I don't see – you'd have to link it somehow differently, where everything would happen on one event. Is that sufficient to constitute a common cause? And I'm having a difficult time concluding that a district judge would be wrong in making that. I mean, the problem with all these cases is they're incredibly fact-intensive. They are. They are. I'm not sure we can give you a bright-line rule for occurrence because of the variety of human conduct. I think you can set certain parameters, and I think to the extent if you could establish maybe a single inspection on a single day that encountered all of the defects ultimately and were not found, I think perhaps that might be that case. But that's not here. But that's never going to happen in a construction project. Rarely. It's just too big and too complicated, and there are too many inspectors. Well, and that's kind of why we pointed this Court to the California cases that have actually looked at this and said, you know, the building, the problems in buildings two and four didn't cause the problems in buildings one and six, and so you can't treat them as one overarching. Because then you're taking too far of a step back. But this was one building, right? This was a conversion of what was happening in a casino or something? Yes. I believe there were several phases. We have to apply Nevada law. But beside that, again, how do you explain this Turnberry decision? Again, that appears to be a district judge, Judge Rawlinson, being correct. Everybody's free to ignore his or her ruling. But the ruling seemed to be that along the lines of Judge Tallman's question, a general contractor was responsible for construction of the development, and the negligence of the general contractor overall resulted in one cause triggering the application of the cause versus these disparate occurrence. Well, we explain that as an incorrect ruling because it's too far removed from what is actually what the policy says we cover, damages caused by an occurrence, not theories of liability. And that's focusing only on the theory of liability. This was a comprehensive general liability policy, was it not? Yes. So if in the construction of the elevators a workman had been injured and had fallen into the shaft, and then in the construction of the plumbing the plumber had dropped a huge piece of pipe on his foot, those would be multiple occurrences, would they not? Yes, if I'm understanding yes. They would be completely separate events and causes of injury. If that's the case, then I'm having a hard time with your answers on the Rubin case. In fact, I don't understand Rubin where the Washoe County case, where each act of molestation is from a common cause, even though we've got multiple victims over. Well, what you also have, and that's why I think the sexual molestation cases are very difficult to extrapolate and apply in any other context, because really there, there's no coverage for the offender, the sexual molester, is never going to get any insurance coverage. So, and that's who's really perpetrated the act. It's the failure to prevent, essentially. But it was the county that was the insured in that case, was it not? Yes. But what I'm saying is there's never going to be coverage for the person that's doing the act, so you're not really connecting those two events. No, I understand that. But the insured there was the county. The county. Here the insured is the developer. I don't understand why the answer wouldn't be the same. Well, because I think the damages are not parsable as it is in here, where you have separate identifiable injury and damages flowing from that can be easily quantified. Why is that any different from my hypothetical, the guy who falls in the elevator shaft and the plumber who damages his foot? Well, because I would think there would be easily determinable damages from the fall and the impact on the foot. It's not going to cause an indivisible injury. But if you have two separate victims of child abuse on two separate occasions, why is that not exactly the same? Well, many courts will find that that is two separate occurrences, that you can't molest two children independently and have that be a single occurrence. Most courts will find that. Other courts will not. In the criminal law, that would be a separate criminal act. Of course it would, yes. Chargeable in separate counts. Yes. And, I mean, we've argued those. I'm sorry, I'm way over. No, no, no. It's fascinating. Yeah, this is helpful, but we do have other cases. So I will give your opponent a couple minutes on rebuttals. Thank you. And, of course, we would respectfully request that you affirm the district court if you do not take up our offer to certify. Thank you. Okay. Thank you very much. And I apologize if I confused you. I do believe that there is one occurrence, because it's a sale of an allegedly defective development, the whole condominium complex filled with these properties. Justice Michael Leidas just told me pretty persuasively that, along with the Turnberry judge, I'm wrong about that because we stepped back too far and we look at a number of occurrences, not proximately, but incorrectly overall. And she has a point there, and Judge Tallman does too. If an individual falls in an elevator shaft and hurts himself, that's the negligence of the person building the elevator shaft. And if a plumber drops a pipe on his foot that's too heavy, that's the negligence of the supplier of the heavy pipe. And that would seem to be two different causes in a construction project. I think what you need to separate out is in Washoe, the court looked at this and said what you have to do is you have to look at not the molester's liability, but the county's liability. And that's where the breakdown happens. Because my opponent is looking at the liability of the individual subcontractors. The definition of occurrence in a CGL policy talks about, it says, an occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. So it's this overall development. And you don't parse out an individual who has its toe broken by the pipe falling out, has its own claim against the plumbing contractor for dropping that pipe. But the homeowners association has one indivisible claim to sue the developer for all of these aggregated defects. So in terms of this is exposure to substantially the same general harmful conditions, liability for building a whole negligently constructed complex, excuse me. And I think that that's the disconnect here. The Washoe and the Bish and Turnberry courts looked at that and said there is one occurrence. It's not like the other, the California case where there were two different developments built at different times. Can I be very honest with you? Very persuasive, very, you know, well-argued. Okay, but I'm a judge that I am. I really don't know. Why don't we certify this to the Nevada Supreme Court and find out what the answer is and get it right? Rather than having us, certainly me, trying to figure out something that is being well-argued by both sides and doesn't appear to have an apparent answer. Well, I think that Washoe and Bish state the rule and there isn't a dispute. Ms. Michaelitis points out very fact-specific instances about those cases that would seem to undermine an overall rule in the State of Nevada. Let me add this one point. The policy also talks about exclusions for the work, for the liability arising out of the work of the subcontractors. And that appears at page 80 of the record. And so I point that out to you because that's the distinction here, is this developer's insurance policy doesn't cover property damage caused by the subcontractor's work. Sotomayor, but even if we certify this, the issue of what constitutes an occurrence to the Nevada Supreme Court, would that result in a difference in this case? Well, yes, because we've submit that the district court judge applied the wrong he applied on its face the causation approach, but got it wrong because of the way he applied it to the facts. He looked at the ultimate effects or the number of damages that were to determine the number of causation. But does it matter if he said there was no material issue of fact because there was no evidence at all put in on the other side? Well, Your Honor, I believe that it goes back to the original court submission that this court was deciding an abstract hypothetical question because ultimately we don't know if there will ever be a judgment in excess of the $1 million primary limits so that anyone has to decide whether there are multiple occurrences in this case. Okay. But if we disagree with you regarding whether or not this was an abstract question, how did the district court err by determining there was no material issue of fact when there was evidence put in on one side and no evidence put in on the other side? Our submission is the evidence he relied upon was not the actual indemnity evidence. It was unproven allegations of the second amended complaint and preliminary defect reports that were not admitted at the time of trial and no underlying trier of fact made any determination as to whether those defects or damages or those problems had ever existed up until that point in time. But you have a problem with that argument because you didn't raise it at the time the summary judgment was solved. Well, Your Honor, we did make these same arguments in our Rule 56 motion to ask the court to not rule on the summary judgment and allow us additional time to come forward. And I submit that we expected under the law that it was going to be granted and we would have an opportunity for briefing on the merits to actually delve down deeper on the number of occurrence issue. But what are you contemplating, if we were to grant you relief and remand, are you contemplating another jury trial where there will be discovery and then evidence presented to a new jury in order to try and identify what the causes are for each of these damages? I would submit, Your Honor, probably the best course of action, which happens more likely than not in types of cases like this, is to request a stay of the determination of the duty to indemnify issue until there is a final judgment in the underlying action. If that case settles or there is a final judgment, it's affirmed on appeal, or if in the unfortunate event it goes back to trial, we won't know what the actual indemnity obligation will be for any of the insurers, the primary or the excess, until there is a final judgment in the underlying action. I mean, obviously you think there are major flaws in what the jury did, but let's assume that this is what the final judgment is going to look like. It doesn't answer any of the questions that you're raising with regard to causation. What you have to drill down, then, is we need to get the record evidence, the testimony, the documentation, the actual final reports that were put in, and then we would submit that that is the evidence upon which you determine the fact-driven issue of whether there was one or more causes. So theoretically, you could end up retrying this case, because depending on what those facts show, there could be contested issues of material fact that would preclude the district judge from granting a declaratory judgment. Correct. But I would submit, Your Honor, again, there's no point. Why shouldn't we ask the State supreme court to tell us, in a construction defect case, is there one causation or can there be multiple causations? Well, Your Honor, I think that you're analyzing the Bish and the Washoe cases correctly, and the Turnberry court got it right. And there is no reason to ask the supreme court of Nevada to answer the question, because they've given enough guidance for this court to do so. So you think if we, even if we tried to certify, they might say thanks for your card and letter, but no thanks, which they can do. They don't have to answer. They're free to do that. And I submit also that the request came a little late in the day. That's my concern, because I don't think it will resolve this case. It would be basically an advisory opinion directing us where to go from here. And I'm not sure that that's a legitimate reason for asking for certification. And we hate to ask and have them say no. It doesn't look good. Okay. I appreciate your time. Well, thank you both. This is a very intriguing little issue. But the case just argued is submitted, and we'll try and figure out what we're going to do with it.
judges: Murphy, Tallman, Rawlinson